ON REHEARING
Appellant Safeco Insurance Co. of New Orleans seeks rehearing of our opinion issued January 30, 1990, reversing the trial court’s granting of its motion for partial summary judgment. After careful reconsideration of our decision, coupled with further research, we have concluded that Safe-co’s arguments have no merit. Although our decision has not changed, we issue this rehearing opinion to clarify our first opinion and address Safeco’s arguments.
First, Safeco challenges our finding that it became a “party” to the contract between the City of New Orleans and Orleans Transportation Services, Inc. (OTSI) when its attorney-in-fact signed the contract simultaneously with representatives of the parties. Safeco claims that it did not become a party to the contract because it gained no interest in the contract by virtue of the signature of its representative. Safeco’s argument is misplaced. Certainly Safeco did not become a “principal” to the contract, but the words “principal” and “party” have different legal meanings. Safeco intervened in the contract between the City and OTSI as surety and, under the Louisiana Civil Code, a surety agreement is an accessory contract to another contract. Therefore, Safeco became an accessory party to the contract when the attorney-in-fact signed the contract simultaneously with representatives of the principals’. Safeco was indeed a party to the contract even though it was not a principal.
Safeco’s second argument is also semantic. It challenges our use of the phrase “initial five-year term,” noting that those specific words are not used anywhere in the contract and implying that those words have some kind of legal significance. The City calls the five-year term specified in the *1305 contract the “primary” term. Whatever the word used to describe the term specified in the contract, the fact is that the contract stated that its provisions would be in force for five years. However, the contract also contemplated that it might be héld over after the expiration of the five-year term. We employed the term “initial” to reflect the fact that a continued relationship between the parties after the expiration of the term was contemplated by the contract and to show that the relationship did continue after the term expired. We did not intend for the word “initial” to convey any other legal significance, nor did we intend to imply that the contract used that word. The fact that the provisions of the contract do not include the word “initial” does not change the result.
Safeco’s third and fourth arguments on rehearing are legal. Safeco maintains that the court’s decision imposes an intent not reflected in the contract document and that the case should have been remanded to the trial court for evidence on intent.
We disagree. As stated in our original opinion, La.C.C. art. 2050 mandates that contract provisions be interpreted “in light of other provisions so that each is given the meaning suggested by the whole.” Safe-co’s arguments on rehearing focus solely on the section of the contract labeled “Term” and ignore the other provisions quoted in our original opinion. However, when all the provisions of the contract are read together, it is obvious that the parties intended for the surety agreement to remain in force should there be a “holding over” of the contract. An other interpretation of the contract would invalidate many of the major provisions of the agreement. Since the intent of the contract is clear, there is no need to remand the case to the trial court for evidence on intent.
The surety contract at issue in the instant case was confected prior to the revision of the suretyship laws in 1987. At the time of the contract, La.C.C. art. 3035 defined suretyship as “an accessory promise by which a person binds himself for another already bound, and agrees with the creditor to satisfy the obligation, if the debtor does not.” In the contract at issue in this case, Safeco made an accessory promise by which it bound itself for OTSI and agreed with the City of New Orleans to satisfy OTSI’s obligations under the contract for ground transportation services, if OTSI did not satisfy its obligations.
In support of its position, Safeco cites former La.C.C. art. 3063, which provided that “prolongation of the term granted to the principal debtor without the consent of the surety, operates as a discharge of the latter” and two ancient cases annotated under that article, Fasnacht v. Winkelman & Heuer, 21 La.Ann. 727 (La.App.Orl.Cir.1869) and Hincks v. Hoffman & Schmedtje, 12 Orl.App. 218 (1915), both of which concern attempts to hold a surety liable on a lease agreement after the expiration of the original terms of the lease. In both cases, the surety was released from liability. Safeco also cites La.C.C. art. 2690, which provides that “the security which may have been given for the payment of the rent shall not extend to the obligations resulting from the lease being thus prolonged.” A review of the Civil Code reveals that that article has been interpreted in only one case (dated 1905), the facts of which do not apply to the controversy here. Of course, all of these legal authorities deal with lease agreements and the contract at issue here is not a lease. However, the agreement is in many respects similar to a lease, so the legal principles described in the authorities, if valid, would apply here.
Nevertheless, we find that the cases and articles cited by Safeco, though superficially applicable, do not control the instant case. A thorough study of the body of suretyship law reveals that the legal authorities cited by Safeco have been modified by subsequent jurisprudential rules, even before the revisions in the black-letter suretyship law went into effect. The jurisprudential changes in this area of the law were described under the heading “Kinds of Suretyship” in the introduction to the revision as follows:
A. Commercial Suretyship.
The original assumption that surety-ship is a gratuitous undertaking entered into as an accommodation for another *1306 also gave rise to the rule that the contract is to be strictly construed in favor of the surety and against the creditor, and that any doubt or uncertainty as to the extent or nature of the undertaking is to be resolved in favor of the surety. The same considerations gave rise to the rule that the creditor can not modify or amend the principal obligation in any manner without the surety’s consent. Such a modification completely and un-qualifiedly releases the surety, even in those cases where the surety has suffered no damage as a consequence of the change or when it is patently advantageous to him.
The rise of modern commerce and the creation of corporations whose business it is to write surety contracts for a fee, led the courts to deny the benefit of the rigid and inflexible rules designed to protect the surety in cases where the surety was a “compensated” one, i.e., when the surety collected a fee for his services. The rationale for this was not entirely founded upon the fact that the surety was compensated for his services. Rather, the courts recognized that the rules in question were devised to protect (and perhaps encourage) the surety who was a volunteer acting out of a spirit of liberality and charity, whose promise to the creditor was a boon from one who received no benefit or advantage from the credit extended by the creditor. The rules of interpretation may still be justified in the case of the surety who is truly a volunteer, uninterested in the transaction between the creditor and debtor. Today however, the overwhelming majority of suretyships are given in business transactions by persons having a direct financial interest in them_ The revised articles codify the rules created by the courts for compensated sureties but extend them to all suretyships given in commercial transactions....
The revised articles reflect the view that one who guarantees the commercial undertakings of another, or of an entity created for commercial purposes should not expect to be treated as a mere volunteer acting for the debtor out of a spirit of liberality, nor should a person or entity entering into a contract for its own commercial ends be so regarded. Finally they assume a business corporation or other artificial entity organized for commercial or business purposes should not expect to be treated with liberality at the expense of the other parties to the contract, merely because it is guaranteeing the debts of another.
Safeco is a sophisticated commercial surety company which enters suretyship agreements as a business. Since the contract went into effect in 1980 and the suit was filed in 1987 just months before the revisions went into effect on January 1, 1988, certainly the jurisprudential rules governing commercial sureties developed prior to the revision should apply to this case, not the ancient rules designed to protect gratuitous sureties. Safeco cannot escape its obligations under the contract between OTSI and the City by citing rules which no longer applied at the time the contract was entered.
Contrary to the cases cited by Safeco, the Louisiana Supreme Court held in American Bank & Trust Co. v. Blue Bird Restaurant & Lounge Inc., 290 So.2d 302 (La.1974) that a surety was not entitled to be released from liability simply because the creditor failed to require monthly payments as specified by the contract because the surety instrument “clearly grant[ed] the bank the right to offer extensions.” In that instance, the agreement itself stated that the bank “may, in its judgment, grant extensions.... ” In the instant case, the City’s right to allow OTSI to hold over is clearly evident on the face of the agreement. Therefore, Safeco cannot be released from liability arising from the period after the expiration of the five-year term.
For the above and foregoing reasons, and for the reasons stated in our original opinion, the trial court’s judgment granting of Safeco’s motion for partial summary, judgment is reversed. The case is remanded to the trial court for further action.